**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

SHAWN GRANTHAM,

       Plaintiff,

       v.                                   Civ. No. 20-584 SCY

KILOLO KIJAKAZI,
Acting Commissioner of
Social Security,[1]

       Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**[2]

       Claimant Shawn Grantham argues that the Administrative Law Judge ("ALJ") who

denied his claim for disability insurance benefits under the Social Security Act, 42 U.S.C.

§§ 401-434, committed several instances of error. Mr. Grantham argues that the ALJ erred in

evaluating a certified nurse practitioner's consultative examining opinion pertaining to his

mental impairments. He also argues the ALJ erred in considering the opinions of two different

consultative examiners related to his physical impairments. The Court cannot follow the ALJ's

reasoning in discounting the nurse's opinion and agrees that the record—as it currently stands—

lacks substantial evidence to discount that opinion. But the Court also finds that Mr. Grantham

has identified no legal error in the ALJ's decision relating to physical impairments. As a result,

---

[1] Kilolo Kijakazi was appointed the acting Commissioner of the Social Security Administration on July 9, 2021, and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 5, 13, 14. The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).

the Court GRANTS Mr. Grantham's Motion To Reverse And/Or Remand, Doc. 24, and remands this matter for further consideration consistent with this Opinion.[3]

## **APPLICABLE LAW**

A.    Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also id.* § 1382c(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential evaluation process ("SEP") to determine whether a person satisfies the statutory criteria as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4] If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

---

[3] The Court reserves discussion of the background, procedural history, and medical records relevant to this appeal for its analysis.

[4] "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a). The claimant's "[w]ork may be substantial even if it is done on a part-time basis or if [he] doe[es] less, get[s] paid less, or ha[s] less responsibility than when [he] worked before." *Id.* "Gainful work activity is work activity that [the claimant] do[es] for pay or profit." *Id.* §§ 404.1572(b), 416.972(b).

(4)     If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of the claimant's past work. Third, the ALJ determines whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

B.      Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the

proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (internal quotation marks omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). "Substantial evidence . . . is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118 (internal quotation marks omitted), or "constitutes mere conclusion," *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Therefore, although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence" and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (internal quotation marks omitted). But where the reviewing court "can follow the adjudicator's reasoning" in conducting its review, "and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The court

"should, indeed must, exercise common sense." *Id.* "The more comprehensive the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection." *Id.*

## ANALYSIS

Mr. Grantham argues that the Court should remand for several reasons. First, he argues the ALJ committed legal error when he referred Mr. Grantham to a nurse, Certified Nurse Practitioner Raya Duenas-Varga, rather than a doctor to perform a consultative mental health examination. The ALJ then compounded this error, he continues, by discounting the very person he appointed (the nurse) as insufficiently qualified and by rejecting the mental health limitations she assessed. Regarding physical limitations, Mr. Grantham argues the ALJ erred when he (1) failed to consider certain factors that arguably render an opinion by Dr. John R. Vigil more persuasive than other examining consultants' opinions; and (2) determined that a limitation on standing in Dr. Em Ward's opinion is "undefined and vague."

The Court concludes that the ALJ committed no error in evaluating the medical opinions related to Mr. Grantham's physical limitations and committed no error in assessing Mr. Grantham's medical limitations. The Court also agrees with the ALJ that the severity of the mental health limitations Nurse Duenas-Varga assessed appear exaggerated when compared to Mr. Grantham's background, which contains very limited mental health diagnosis and treatment. However, having discounted the opinion of Nurse Duenas-Varga, the record contains insufficient information for the ALJ to assess the severity of Mr. Grantham's mental health limitations. As a result, the Court remands this case so that the Commissioner can obtain additional medical source information about Mr. Grantham's mental health limitations.

## I.     Standard of review

The ALJ is required to evaluate every medical opinion he receives that could have an effect on the RFC. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161-62 (10th Cir. 2012); *Doyal v.*

*Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003). For claims filed before March 27, 2017,[5] as the present claim is, medical opinions are classified into two different categories: "acceptable medical sources" and "other sources." "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1; SSR 96-2p, 2017 WL 3928298.

A unique two-step rule applies to the opinions of treating physicians (acceptable medical sources who provide or have provided the claimant with medical treatment and who have an ongoing relationship with the claimant). First, the ALJ must determine whether the opinion is entitled to "controlling weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." *Id.* (internal quotation marks omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.* If it is not given controlling weight, "at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330.[6]

---

[5] For claims filed on or after March 27, 2017, all medical sources can provide evidence that is categorized and considered as medical opinion evidence and subject to the same standard of review. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).

[6] Prior to March 27, 2017, the factors in the regulation were: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a

The ALJ is not, however, required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, the decision need only be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (internal quotation marks omitted). The Tenth Circuit has also expressed this as a requirement that the ALJ provide "specific and legitimate reasons" for rejecting an opinion. *Doyal*, 331 F.3d at 764; *Watkins*, 350 F.3d at 1301. The ALJ's reasons are reviewed for substantial evidence. *Doyal*, 331 F.3d at 764.

## II.    Mental limitations

### A.    Summary of mental health evidence

This is the third time Mr. Grantham's disability application has come to federal court. In 2011, Mr. Grantham filed his first disability applications under Titles II and XVI, which were denied. AR 784. Mr. Grantham appealed and this District Court remanded the case on November 23, 2016, ordering a function-by-function analysis of the claimant's residual functional capacity. *Id.* While that appeal was pending, in August 2016, the claimant filed another application for supplemental security income under Title XVI. *Id.* On remand from the District Court, the Appeals Council ordered that the claimant's applications should be consolidated and a single record created. AR 784-85. In January 2018, ALJ Pardo held another hearing, during which Mr. Grantham denied having any mental health issues. AR 457. ALJ Pardo denied Mr. Grantham's applications; Mr. Grantham appealed again; and the District Court reversed and remanded again,

---

specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)).

with instructions to more fully address the findings and medical opinions of Dr. Karl Moedl, Dr. Ward, and Dr. Vigil. AR 785.

On remand, Mr. Grantham's representative submitted a letter dated September 23, 2019 to ALJ Eric Weiss suggesting that Mr. Grantham has cognitive-behavior limitations secondary to possible traumatic brain injury, and requesting a psychological evaluation. AR 1057. The State agency referred Mr. Grantham to Certified Nurse Practitioner Raya Duenas-Varga to evaluate his mental limitations. AR 1115. ALJ Weiss held another hearing on November 5, 2019, and denied Mr. Grantham's applications. AR 784, 821. This appeal followed. Doc. 1.

ALJ Weiss's opinion is extremely lengthy and thorough. AR 784-812. Analysis of Mr. Grantham's physical limitations, however, dominate, as Mr. Grantham's mental limitations did not become an issue, as far as the Court can tell, until the representative letter of September 23, 2019. Thus, the record on Mr. Grantham's mental health is thin. The ALJ found that Mr. Grantham has the severe mental impairments of unspecified depressive disorder and antisocial personality disorder with narcissistic personality traits, but that they do not meet any listings. AR 789, 792-794. The ALJ noted that "in August 2011, the State agency non-examining psychological experts felt the claimant had no severe mental impairments." AR 792. At step four, the ALJ assigned the following mental RFC: "[T]he claimant is able to understand, remember and carry out simple instructions and make commensurate work related decisions in a work setting with few, if any, changes. He is able to interact occasionally with supervisors and co-workers but can tolerate little, if any, interaction with the public. Finally, the claimant is able to maintain concentration, persistence and pace for two hours at a time during the workday, with normally scheduled breaks." AR 794.

Mr. Grantham alleged that he had been unable to sustain employment since February 1, 2009 because of his conditions. AR 796. However, the ALJ noted "that the claimant worked after this date, at or above substantial gainful levels, at jobs that included day laborer and in production." *Id.* In May 2014, on referral from his probation officer due to alcohol and cannabis dependence and depression, Mr. Grantham attended one session of behavioral health treatment after intake. AR 804. At intake, he was found to have moderately severe depression. *Id.* Pursuant to her one session with Mr. Grantham, Blanca Elia, LPCC listed diagnoses of alcohol dependence, cannabis dependence, depressive disorder, and antisocial personality disorder. AR 805. Shortly thereafter, on July 1, 2014, Mr. Grantham was discharged due to noncompliance. *Id.* His mental health diagnoses were listed as an unclassified depressive disorder, alcohol dependence, tobacco dependence, and polysubstance dependence. *Id.*

In August 2015, his parole officer referred Mr. Grantham for a mental health assessment at Laguna Behavioral Health Services. AR 804; *see* AR 1080-87. Mr. Grantham reported to Megan Parmley, Ph.D., that he had a history of seeing mental health counselors throughout his life, which gave him the skills to manipulate anyone. AR 804. Mr. Grantham was asked to attend a follow up appointment to complete the assessment, but he left because he was reportedly too angry to complete the assessment. *Id.* In January 2017, Mr. Grantham went to his primary care clinic and denied having any mental health symptoms. AR 800. In January 2018, Mr. Grantham testified at a hearing before an ALJ that he did not have any mental health issues (but he was trying to find out about depression, which he had been investigating on his own) and that he had been seeing a counselor about his alcohol abuse for about two years. AR 802. The ALJ noted that there is no history in the file that Mr. Grantham had seen mental health counselors throughout his life. AR 805. In October 2019, based on the records from August 2015, Laguna

Behavioral Health Services noted diagnoses of antisocial personality disorder, narcissistic personality disorder traits, posttraumatic stress disorder, and substance dependence. AR 1076.

The ALJ summarized this evidence and concluded that "the claimant has received very little mental health treatment, and it appears that it has been only on referral from his probation/parole officers. He does not appear to have sought treatment on his own and generally denied symptoms of mental impairments during his office visits, at least until around 2018." AR 803. "Prior to the March 31, 2010 date last insured for Title II, there is no evidence in the record that would support a medically determinable mental impairment other than substance abuse." AR 807. "For purposes of the claimant's supplemental security income claim, the very recent medical records document the presence of a severe medically determinable mental impairment." *Id.* Mr. Grantham underwent a psychological evaluation on December 21, 2019, on referral from the state agency. AR 805.

After conducting this psychological evaluation, Certified Nurse Practitioner Raya Duenas-Varga concluded that the claimant met diagnostic criteria for an unspecified depressive disorder, with a rule-out diagnosis of PTSD, and for antisocial personality disorder. AR 806. Mr. Grantham's reported history of altercations and apparent difficulty working with others could interfere with his ability to listen, relate, engage, or attend to stimuli outside of himself. *Id.* She concluded that the claimant had adequate ability to understand, retain, and follow instructions; adequate ability to sustain attention to perform simple, repetitive tasks; impaired ability to relate to others; and impaired ability to tolerate the stress and pressures associated with day-to-day work activity. *Id.* Nurse Duenas-Varga opined that Mr. Grantham was moderately restricted in the ability to interact appropriately with the public, markedly restricted in the ability to interact

appropriately with supervisors and coworkers, and markedly limited in the ability to respond

appropriately to usual work situations and to changes in a routine work setting. *Id.*

The ALJ evaluated the opinion as follows:

> Under the applicable rules, Nurse Duenas-Varga is not an acceptable medical
> source. In addition to seeing the claimant only one time, as is true for all of the
> consultative examining sources in this case, Nurse Duenas-Varga conflates
> physical and mental impairments in opining that the claimant's conditions may
> possibly make it more difficult for him to seek, obtain, and maintain employment.
> There are very few mental health treatment notes, the claimant previously denied
> being depressed or having mental impairments, he self-diagnosed depression and
> anxiety after researching those conditions, and his mental health treatment records
> in the case file reflect that his recent treatment was at the request of his parole/
> probation officers, not because the claimant sought treatment independently. His
> treatment was generally prompted by his substance abuse, and in this case, Nurse
> Duenas-Varga seems to rely on unverified anecdotes and generalizations in
> reaching her opinion that the claimant has marked limitations - which are
> otherwise not supported by the overall record. The claimant's mental health
> treatment records are recent, and do not reflect severe, medically determinable
> mental impairments throughout the period at issue. Nevertheless, although I give
> limited weight to Nurse Duenas-Varga's opinions for the reasons above, I find
> there is sufficient evidentiary support for a limitation to simple work with few
> workplace changes and some limitations in social interaction.

AR 809.

B.    <u>Plaintiff's arguments</u>

Mr. Grantham challenges the ALJ's evaluation on several fronts. First, he argues that the

State agency should not have sent Mr. Grantham to a consultative examination with a

nonacceptable medical source. Doc. 24 at 23; Doc. 29 at 2. In other words, Mr. Grantham argues

legal error in the decision to use Nurse Duenas-Varga in the first place. He cites two regulations

in support of this theory, neither of which state that the disability determination agency cannot

use nonacceptable medical sources for consultative examinations. Mr. Grantham cites 20 C.F.R.

§ 404.1513 (effective prior to March 27, 2017), which defines categories of evidence and sorts

them into "acceptable medical sources," § 404.1513(a), and "other sources," including

"[m]edical sources not listed in paragraph (a) of this section (for example, nurse-practitioners),"

§ 404.1513(d)(1). That is, this regulation defines nurse-practitioners as "medical sources," but not "acceptable medical sources." It does not discuss consultative examinations.

POMS DI 22510.010[7] states that the Administration will use an acceptable medical source for a consultative examination ("CE") only if necessary to establish the existence of a medically determinable impairment. *Id.* § C(2)(a). In this case, the ALJ found that a medically determinable mental impairment existed. Therefore, if the purpose of the consultative examination was "to document the severity of the impairment and its effect on the claimant's functioning," an acceptable medical source is not necessary. *Id.* § C(2)(b); *cf. Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997) ("the Secretary has broad latitude in ordering consultative examinations").

In support of his argument otherwise, Mr. Grantham cites 20 C.F.R. § 404.1519(g)(a). Doc. 24 at 23. There is no subsection (g) in § 404.1519, but Mr. Grantham is likely referring to section 404.1519g, which governs consultative examinations. That regulation states: "We will purchase a consultative examination only from a qualified medical source. The medical source may be your own physician or psychologist, or another source. If you are a child, the medical source we choose may be a pediatrician. For a more complete list of medical sources, see § 404.1513." 20 C.F.R. § 404.1519g (effective prior to March 27, 2017). The Court notes that the regulation says "qualified" medical source, rather than "acceptable" medical sources, and cross-

---

[7] The Social Security Administration Program Operations Manual System ("POMS") is "a set of policies issued by the Administration to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999). The reviewing court will defer to the POMS provisions unless they are arbitrary, capricious, or contrary to law. *Ramey v. Reinertson*, 268 F.3d 955, 964 n.2 (10th Cir. 2001).

The version of POMS DI 22510.010 in effect prior to March 27, 2017 had similar provisions relating to consultative examinations with nonacceptable medical sources. DI 22510.010 § C(2) (effective from Sept. 22, 2016 through Mar. 23, 2017).

references § 404.1513—which, as discussed above, defines nurse practitioners as medical sources. The Court understands "qualified" to mean properly licensed. In short, the Court does not agree that the Commissioner's regulations prohibit the use of nurse practitioners who are properly licensed under the relevant nurse practitioner licensing scheme.

Mr. Grantham nonetheless argues it is unreasonable for the ALJ to discount the consultative examination because it was not from an acceptable medical source. After all, he argues, it was the State agency who made the decision to send Mr. Grantham to a nurse practitioner. Doc. 24-25. While the Court agrees with this argument in principle, the Commissioner is correct that the ALJ did not give this as a reason for discounting Nurse Duenas-Varga's opinion. The ALJ observed that Nurse Duenas-Varga is not an acceptable medical source, which is a legally correct statement under the pre-March 2017 regulations, and *then* proceeded to launch into an explanation of why the ALJ discounted her opinion. AR 809. The Court agrees the ALJ would have done better to recognize that the agency (not Mr. Grantham) selected a nonacceptable medical source to perform this evaluation, and to be explicit that this was not a reason the ALJ was discounting the opinion. However, the Court does not view this statement as reversible error in this context.

Mr. Grantham stresses that the ALJ also observed that "other source" opinions "can be considered, but in general, are entitled to less weight than is accorded opinions of 'acceptable medical sources.'" Doc. 19 at 3; AR 810. But there is no other medical source opinion in the file pertaining to mental limitations; the ALJ did not accord an acceptable source medical opinion more weight than Nurse Duenas-Varga's opinion. Therefore, the Court views this language as boilerplate and certainly not error.

Second, Mr. Grantham argues that the ALJ erred by stating Nurse Duenas-Varga's opinion "conflates physical and mental impairments." AR 809; Doc. 24 at 25. Mr. Grantham argues that this statement is not explained and notes that Nurse Duenas-Varga's "explanation for finding marked limitations in social functioning and adaptation. . . has nothing to do with physical functioning." Doc. 24 at 25. Mr. Grantham argues that the general reference on AR 1120 to both physical and mental impairments making it more difficult to seek, obtain, and maintain employment should not carry over into her opinions on social and adaptive limitations. Doc. 24 at 25. The Court agrees. But the ALJ's reasoning about physical and mental impairments applies only to Nurse Duenas-Varga's opinion on AR 1120 that "these challenges may possibly make it more difficult for him to seek, obtain, and maintain employment." Nurse Duenas-Varga's statement that both Mr. Grantham's physical and mental impairments "may possibly make it more difficult" for him to work is not much of an opinion—it says nothing about how a specific mental impairment bears on a specific work requirement. Thus, how the ALJ treated this statement has little significance.

Noting that Nurse Duenas-Varga was not tasked with assessing Mr. Grantham's physical impairments, however, does not constitute error in any event. More important than what the ALJ said about Nurse Duenas-Varga's general statement is whether the ALJ gave other reasons for rejecting the more pertinent portions of Nurse Duenas-Varga's opinion. *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (an ALJ must explain why he adopted some restrictions from a medical opinion but not others).

Mr. Grantham, of course, challenges the other reasons the ALJ gave for rejecting Nurse Duenas-Varga's opinion. Doc. 24 at 25-26. As Mr. Grantham recognizes, "[t]he ALJ discredits Ms. Duenas-Varga's opinions because Plaintiff has had little mental health treatment, denies

14

being depressed, self diagnoses himself with anxiety and depression, and does not seek mental
health treatment independently." *Id.* at 25; AR 809. Mr. Grantham argues that "the ALJ fails to
consider the consistency of Ms. Duenas-Varga's observations and opinions with those of other
medical providers." *Id.* Mr. Grantham argues the ALJ should have credited the following
evidence as consistent with Nurse Duenas-Varga's opinion:

- On November 9, 2009, Mr. Grantham presented to the emergency room. The record
  reflects that the "Patient [was] brought in by Tribal Police, intoxicated and
  belligerent, here for clearance to go to jail." AR 302. He was diagnosed with alcohol
  abuse and cleared for incarceration. *Id.*

- On September 6, 2014, Mr. Grantham presented to the emergency room after being
  assaulted. AR 294. He reported that he had been drinking and was awakened when
  assaulted. *Id.*

- On April 21, 2015, Mr. Grantham presented to Dr. Parmley of Laguna Behavioral
  Health Services for a mental evaluation. AR 1080-87. Plaintiff became angry with Dr.
  Parmley about the limits of confidentiality and making him look bad. *Id.* Dr. Parmley
  performed a mental status examination abnormal for fair insight/judgment;
  psychomotor agitation; defensive/aggressive attitude; tangential speech; loud voice;
  anxious mood; annoyed and angry affect; tearful/frustrated affect. *Id.* Dr. Parmley
  diagnosed Plaintiff with grandiose self-importance, entitlement, lacking empathy. *Id.*
  Plaintiff did not complete the examination due to his anger. *Id.* On May 20, 2014,
  Blanca Elia, LPCC of Laguna Behavioral Health Services conducted a mental status
  examination abnormal for labile affect, guarding, hostility, cold stare, very dark
  places, severely impulsive judgment, anxious/depressed mood, mood swings,
  agitation, loud speech, hostile voice, contempt for others, racing thoughts, and
  verbally/physically abusive both sober and under the influence. AR 1103-105.

*See* Doc. 24 at 25-26.

The Court disagrees with Mr. Grantham's position that these incidents prevent the ALJ
from discounting Nurse Duenas-Varga's opinions. The first two incidents indicate that Mr.
Grantham has problems with others when he drinks, not that he would have problems with others
at work, when he has not been drinking. LPCC Blanca Elia's incomplete examination of Mr.
Grantham also provides little useful information because Mr. Grantham left before the LPCC
could complete the examination. Notably, Mr. Grantham's agitation during this examination

might have been the result of circumstances isolated to this examination (having to attend the examination at the direction of his probation officer) rather than the result of an overarching mental disability.

The Court does agree with Mr. Grantham, however, that substantial evidence does not exist to support the ALJ's RFC assessment regarding Mr. Grantham's mental health. Once the opinion of the only medical source on mental health is disregarded, little remains on which to base an RFC assessment. This is not a case where the ALJ disregarded the only medical source opinion on the basis of contradictory evidence. Instead, the ALJ disregarded the only medical source opinion based on a *lack* of evidence in the file (lack of treatment; interrupted treatment; failure to seek treatment). Lack of evidence is not substantial evidence.

Moreover, although that fact that Mr. Grantham has not sought mental health treatment is relevant, other factors in the record caution against drawing too strong an inference from this fact. Two probation officers independently identified Mr. Grantham as having mental health issues and, as a result, referred him to mental health counseling. This provides evidence that others recognized Mr. Grantham as having mental health issues even if Mr. Grantham did not himself fully acknowledge having such issues. As the ALJ noted, when Nurse Duenas-Varga evaluated Mr. Grantham, she determined that "[h]is judgment and insight were deemed impaired, as evidence by his lack of treatment for psychiatric symptoms." AR 806. In other words, Nurse Duenas-Varga, the only medical source to opine on Mr. Grantham's mental health, considered Mr. Grantham's failure to seek mental health treatment as evidence for, not against, a finding of mental health issues. All of this diminishes the extent to which Mr. Grantham's failure to seek mental health treatment can be used to discount Nurse Duenas-Varga's findings of marked mental health limitations.

Finally, the ALJ's opinion appears to be internally inconsistent. The ALJ found that, "[f]or purposes of the claimant's supplemental security income claim, the very recent medical records document the presence of a severe medically determinable mental impairment." AR 807. The ALJ's opinion discussed records from 2015 supporting the existence of a severe mental impairment, records from 2017 and 2018 tending to show that he had no mental impairments, and one record from 2019 summarizing a 2015 visit and adding nothing new. AR 803-05. The ALJ did not explain why he ordered the consultative examination or why he found Mr. Grantham's mental impairments to be severe. *Cf.* AR 857-58; AR 789-90, 807. It is simply not clear to what "very recent medical records" the ALJ is referring.

It is possible that the "very recent medical records" refer to Nurse Duenas-Varga's evaluation. But if "the very recent medical records" refer to Nurse Duenas-Varga's evaluation, then it was—as Mr. Grantham points out—error to send Mr. Grantham to a non-acceptable medical source to make the determination of a severe impairment. As discussed above, a non-acceptable medical source cannot establish whether an impairment is severe. The non-acceptable medical source can only evaluate the limitations resulting from an existing severe impairment. Thus, for the Commissioner to prevail, the Court must assume the ALJ found a severe mental impairment existed independently of Nurse Duenas-Varga's evaluation rather than as a result of her evaluation.

This assumption, however, comes with its own problems for the Commissioner. If the ALJ found a severe mental impairment existed independently of Nurse Duenas-Varga's evaluation, then the ALJ effectively ordered a psychological consultative examination due to a

lack of evidence sufficient to determine the severity of Mr. Grantham's mental limitations.[8] But if the record was insufficient to determine the severity of Mr. Grantham mental limitations (necessitating Nurse Duenas-Varga's evaluation), how can that same record serve as the sole justification to disregard Nurse Duenas-Varga's opinion that Mr. Grantham has severe mental limitations? In other words, the ALJ would have had to agree there was insufficient information in the file to evaluate the limitations from Mr. Grantham's mental impairments after making a finding of severity at step two. That same insufficient information then cannot constitute "substantial evidence" to disregard the only medical source opinion in the file. Rather, as detailed above, the very limited mental health information that appears in the file does not contradict Nurse Duenas-Varga's opinion.

Ultimately, the Court cannot follow the adjudicator's reasoning. In addition, the ALJ's decision to disregard the only evidence in the file assessing the limitations of the mental impairments lacks substantial evidence as the record currently stands. Therefore, the Court remands to the ALJ to reconsider the evaluation of Nurse Duenas-Varga's opinion, or to further develop the record with respect to Mr. Grantham's mental limitations.

## III.   Physical limitations

### A.   Dr. Vigil

The claimant underwent a consultative medical examination with John R. Vigil, MD on December 11, 2017, at the request of his representative. AR 771, 800. The ALJ's discussion of Dr. Vigil's opinion is extensive:

> John Vigil, M.D., took the claimant's history and performed a physical
> examination. He also reviewed the consultative examination reports by Dr. Ward

---

[8] The Commissioner may order a consultative examination when the existing record lacks "sufficient medical evidence about your impairment for us to determine whether you are disabled." 20 C.F.R. § 404.1517.

and Dr. Moedl, as well as treatment notes from the hospital. He noted that the claimant fractured his elbow at age five; was status-post ORIF following the left femur fracture; and status-post ORIF following the left tibia/fibula fracture; and experienced pain, numbness, and weakness in the left leg following the stabbing. Dr. Vigil noted that the claimant had been able to work after these injuries, but reported progressively worsening pain in the left leg, in the neck, in the right elbow, in the low back, and in both knees. He noted the claimant's complaints of low back pain, neck pain, bilateral knee pain, left lower extremity pain with paresthesias, and right elbow pain. The claimant indicated that he tried to work in 2009, but could not stand or walk long enough to keep a job, due to his pain. Despite the claimant's report of being in pain at a level of 8/10, he did not appear to be in any acute distress and was not taking any medication for pain. Dr. Vigil noted that the claimant drove himself to the appointment, was appropriately dressed, and reported that he had not worked since 2008. He did not use a cane or other assistive device to walk. Dr. Vigil also noted that the claimant exhibited normal and appropriate pain behavior during the examination. He reported taking non-steroidal anti-inflammatory medication, but avoided narcotics. He smoked marijuana and had applied for a medical cannabis card. However, I note that there is an absence of evidence in the medical record reflecting any medical provider's recommendation that the claimant pursue obtaining certification for medical marijuana, or that it would be appropriate in the claimant's case. The claimant walked into the examination room slowly and stiffly, with a moderate limp. On examination, the claimant exhibited a slow and antalgic gait, was unable to walk on toes or heels, was unable to complete a full squat, had some difficulty getting onto the examination table, and experienced some pain when changing positions on the examination table. He was able to stand from being seated in the chair, without assistance. Dr. Vigil noted that the claimant's extremities were all grossly functional, without gross deformities or abnormalities, and the claimant had normal pulses. Dr. Vigil also noted that the claimant reported moderate pain upon palpation of the lumbar spine, had some paraspinous muscle spasms, and exhibited some tenderness along the lumbar spine. He also exhibited bilateral sacroiliac tenderness, but had negative straight leg raise testing. The claimant exhibited some decreased mobility of the lumbar spine and had significant muscle atrophy in the left leg, good range of motion in the knees, and right elbow swelling in a fixed deformity of the elbow joint; the elbow was fixed at about 45 degrees flexion with some forearm atrophy and moderate tenderness of the elbow joint. The claimant reported that weather changes and physical activity made the pain worse, but hot baths helped. The claimant reported he could lift and carry no more than 10 pounds, could stand for no more than 10 minutes, and could walk no farther than 100 feet. He did not use a cane, but reported being prone to falling due to the weakness in his left leg and the pain in his knees. He was able to perform all personal care activities, but did no household chores or yard work. Dr. Vigil concluded that the claimant had "moderately severe to severe functional limitations" and was "severely limited functionally in both vocational and avocational activities" due to his pain and left leg weakness.

On January 9, 2018, Dr. Vigil also completed an Assessment of Ability to Do Work-Related Activities (Physical) (Exhibit 18F) in which he expressed his opinion that the claimant could never lift any weight due to severe pain and weakness in the left lower extremity, chronic low back pain, and chronic degenerative joint disease of both knees. Dr. Vigil also felt the claimant could sit, stand, and walk for less than 30 minutes each during an eight-hour workday, and required the use of an assistive device (even though I note that the claimant did not generally use one to this point in time) for walking, balancing, and to reduce pain. Dr. Vigil further felt that the claimant could never reach in any direction with his right hand, could never push or pull with his right hand, but could frequently handle and finger with both hands, and could frequently reach, push, and pull with the left hand. He felt the claimant could frequently operate foot controls with the right foot, but could never operate foot controls with the left foot, due to weakness in the left lower extremity. Dr. Vigil also felt the claimant could never crouch, kneel, stoop, balance, or climb ramps and stairs. Dr. Vigil also completed a Medical Assessment of Ability to Do Work-Related Activities (Non-Physical), in which he indicated that the claimant experienced a pain-producing impairment, the claimant's pain was severe, the claimant had sleep disturbances, and the claimant had to rest or lie down at regular intervals due to his pain and/or fatigue. Dr. Vigil expressed his opinion that the claimant was markedly impaired in maintaining physical effort for long periods without the need to decrease activity or pace, or to rest intermittently. He felt the claimant was markedly limited in the ability to complete a normal workday and workweek without interruptions from pain or fatigue-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Vigil also felt that the claimant was moderately limited in maintaining attention and concentration for extended periods (such as two-hour segments); in performing activities within a schedule; in maintaining regular attendance and be punctual within customary tolerances; and in working in coordination with or in proximity to others without being distracted by them. Dr. Vigil indicated that the claimant had "severe functional deficits in 3 extremities."

AR 800-01. The ALJ gave "limited weight" to Dr. Vigil's opinions. AR 809. The ALJ, again,

explained this conclusion at length:

Dr. Vigil found that the claimant's left thigh had decreased sensitivity, the claimant had a slow and antalgic gait, he was unable to completely squat, and he guarded his left knee. The claimant showed moderate pain and had some difficulty with changing positions on the examining table, but he had good range of motion in the neck, although some tenderness was reported. The claimant also had some tenderness and reduced mobility of his [l]ow back, but good range of motion in the knees with good stability and some crepitus, but no swelling. The claimant's right elbow was fixed at 45 degrees flexion, with moderate tenderness. Dr. Vigil felt the claimant had moderately severe to severe functional limitations due to chronic pain. The checklist form completed by Dr. Vigil would place the claimant at less than sedentary exertional capacity, even though the clinical

20

findings were not significantly different from the findings during the previous two consultative examinations, when the claimant was found capable of far more work-related activity. The treatment records similarly do not support such extreme limitations, and the claimant's own reported activities and abilities are very inconsistent with Dr. Vigil's opinions. For example, Dr. Vigil did not indicate that the claimant was unable to dress and undress, or that he had difficulty bending in any other respect, yet he found the claimant unable to perform bending during a workday. He found the claimant unable to balance at all during an eight-hour workday, although the claimant did not use a cane to walk or balance at any time during the examination. Dr. Vigil found the claimant was limited to less than 30 minutes of sitting, but the claimant drove himself to the appointment, a distance of about an hour from his home in New Laguna, New Mexico. Despite the claimant's repeated demonstrations of the ability to reach with his right arm (although he could not extend the arm as far as his left), Dr. Vigil expressed the opinion that the claimant could never reach in any direction with his right hand and could never push or pull with his right hand. As is reflected in the chronology of the claimant's treatment records and third-party statement, the objective and subjective record is similarly unsupportive of the near-vegetative limitations to which Dr. Vigil opined. I give limited weight to Dr. Vigil's opinions; they are a significant overstatement of the claimant's limitations as shown by the claimant himself and by his medical records.

AR 808-09. Mr. Grantham challenges the ALJ's evaluation of Dr. Vigil's opinion on several fronts.

First, Mr. Grantham argues that "the ALJ makes baseless assumptions about Plaintiff driving an hour to get to Dr. Vigil's office. In fact, there is no evidence indicating that it takes an hour to drive from Laguna to Dr. Vigil's office." Doc. 24 at 26. "[W]hen an agency takes official or administrative notice of facts, a litigant must be given an adequate opportunity to respond." *Heckler v. Campbell*, 461 U.S. 458, 469 (1983). The Tenth Circuit has held that social security applicants are constitutionally entitled to "a meaningful opportunity to address the post-hearing evidence," *Yount v. Barnhart*, 416 F.3d 1233, 1236 (10th Cir. 2005), and the Court could see how this right would apply to evidence in the ALJ's hearing decision that Mr. Grantham did not have an opportunity to respond to at or before the hearing.

Mr. Grantham could have raised this issue in a post-hearing letter to the ALJ or before the Appeals Counsel, but he did not. Mr. Grantham does not actually discuss in his motion or

reply whether he had any opportunity to respond to the ALJ's administrative finding that it takes

an hour to drive from Laguna Pueblo to Albuquerque. Nor does Mr. Grantham present any

argument to this Court to convince it that the error, if any, is prejudicial because driving from

Laguna Pueblo to Albuquerque does *not* require an hour of continuous sitting. Mr. Grantham

does not develop any argument that he, for instance, had to ask his ride to stop along the way

because he could not sit for the whole drive. In other words, Mr. Grantham does not controvert

that Laguna Pueblo, without traffic, is an hour or just under an hour's drive, depending on the

destination in Albuquerque. The Court does not see how it was unfair of the ALJ to take notice

of this fact when Mr. Grantham and his counsel would have also been aware of the well-known

and undisputed fact that Laguna Pueblo is about fifty miles from Albuquerque.

Second, Mr. Grantham argues that the ALJ "fail[ed] to consider important details of Dr.

Vigil's report that reinforce its accuracy and credibility." Doc. 24 at 26-27. Mr. Grantham argues

the ALJ erred in the following respects, and the Court disagrees for the following reasons (set

forth separately immediately after the bullet point):

- Dr. Vigil, unlike the other consultative examiners, documented exactly which medical records he reviewed. These records included the previous consultative examinations by Drs. Moedl and Ward. AR 771-72.

  Contrary to Mr. Grantham's argument that the ALJ failed to consider this point, the ALJ explicitly recognized that Dr. Vigil "reviewed the consultative examination reports by Dr. Ward and Dr. Moedl, as well as treatment notes from the hospital." AR 800.

- Dr. Vigil, unlike the other consultative examiners, specifically documented the time he spent examining Plaintiff and reviewing his medical records. AR 771.

  Mr. Grantham does not explain why the amount of examination time is probative evidence. The regulations state that "because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions." 20 C.F.R. § 404.1527(c)(3). The regulations do not mention "amount of examination time" as a factor in weighing a medical opinion.

- Dr. Vigil, unlike the other consultative examiners, specifically provided that his opinions are stated to a reasonable medical probability. AR 775.

  Again, the regulations state that the Administration will evaluate the examining source opinion based on whether it provides "supporting explanations." Using a particular phrase to describe the opinion does not seem to be a supporting explanation.

- Unlike the other consultative examiners, Dr. Vigil is a "certified independent medical examiner." AR 771.

  Mr. Grantham does not explain what this phrase means or why it is relevant. Nor does Mr. Grantham address why Dr. Vigil's certifications are relevant to the evaluation of his opinion under § 404.1527(c). Again, the Court finds that the ALJ discussed the relevant aspects of the opinion: its supportability and consistency with the record.

*Cf.* Doc. 24 at 26-27.

The Court does not find any legal error in the specific points Mr. Grantham raises. Nor does the Court find legal error when these specific points are aggregated. The Court also declines to consider Mr. Grantham's argument, raised for the first time in reply, that the ALJ failed to meaningfully discuss Dr. Vigil and Dr. Moedel's findings regarding Plaintiff's left quadricep. Doc. 29 at 5-6.

B.    <u>Dr. Ward</u>

Finally, Mr. Grantham challenges one particular point in the ALJ's evaluation of the opinion of Em Ward, MD. The ALJ discussed this opinion and found:

> The claimant was also examined by Dr. Ward in December 2016 (Exhibit 14F). At this time, the claimant reported that his primary source of disability was back pain, and he stated he could lift only 10 pounds, sit for 30 minutes, and stand or walk for 10 to 15 minutes. He also admitted to being able to perform overhead work. The clinical findings during this examination were fewer than in 2011, and the opinion again does not include a function-by-function statement of the most work-related activity the claimant can do. However, there are some findings consistent with finding the claimant has work-related limitations. These include the positive FABER test for right hip pain, the claimant's asymmetrical gait, the bony irregularity of the right elbow with incomplete extension, and some decreased lower extremity strength. In contrast, the claimant was able to get out of the chair and onto the examination table without difficulty, and he was able to remove and replace his socks and shoes, indicating mobility consistent with an

> ability to bend and stoop. Although such terms as the statement that "prolonged" standing may be "problematic" are undefined and vague, leading me to give limited weight to his opinions, Dr. Ward's findings and opinion overall are consistent with the limitation to a range of work at the light exertional level, with additional postural and reaching limitations.

AR 808.

Mr. Grantham argues that Dr. Ward's opinion on "prolonged standing" is not vague. Doc. 24 at 27. The Court disagrees. The full extent of Dr. Ward's statement is: "Prolonged standing may be problematic. Weight loss and a regular ankle stabilization program may be beneficial." AR 746. The Court agrees with the ALJ that this is not a useful work-related functional capacity statement. It does not define "prolonged" and does not—contrary to Mr. Grantham's assumptions—provide a foundation for the ALJ to fashion a particularized "sit/stand option" hypothetical to the VE. The statement uses the word "may" and then relates to recommendations for improving Mr. Grantham's overall health such as weight loss and stabilizing his ankles. The Court does not find error in the ALJ's characterization of this statement as "undefined and vague." *Cf. Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) (affirming where the physician's language "does not indicate exactly what plaintiff can do in relation to the physical exertional requirements of sedentary, light, moderate, or heavy work").

The remaining arguments Mr. Grantham makes regarding Dr. Ward are arguments Mr. Grantham makes for the first time in his reply brief. For instance, Mr. Grantham asserts that the ALJ's discounting of Dr. Ward's limitation as vague is "pretextual." Doc. 29 at 6. The Court does not address arguments raised for the first time on reply. In sum, the Court affirms the ALJs decision as it pertains to Dr. Ward.

## CONCLUSION

For the reasons stated above, Mr. Grantham's Motion To Reverse And/Or Remand, Doc. 24, is **GRANTED** so that the Commissioner can reevaluate Nurse Duenas-Varga's opinion or obtain further information about the condition of Mr. Grantham's mental health.

**STEVEN C. YARBROUGH**
**United States Magistrate Judge**
**Presiding by Consent**